Gordon S. NEFF, individually as the surviving partner of Stanley B. Neff and Sons, a co-partnership; and as Administrator of the Estate of Stanley B. Neff, deceased, Appellants,

v.

WESTERN COOPERATIVE HATCHERIES, a corporation, Appellee.

No. 5425.

United States Court of Appeals Tenth Circuit.

Jan. 16, 1957.

Elias Hansen, Salt Lake City, Utah (J. Grant Iverson, Salt Lake City, Utah, on the brief), for appellants.

Arthur H. Nielsen, Salt Lake City, Utah, for appellee.

Before PHILLIPS, MURRAH and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

This appeal was taken from a judgment rendered upon a verdict in favor of plaintiff-appellee, Western Cooperative Hatcheries, on its complaint for money due under a contract with defendants-appellants for the sale of turkey poults, and against defendants on a counterclaim for damages accruing because of an alleged misrepresentation. Diversity of citizenship of the parties and a demand for the payment of $6,015.45 provided the jurisdictional requirements for trial in the United States District Court for the District of Utah. The seller of the turkeys is a Washington corporation and the buyer a Utah partnership.

The issues were determined at pre-trial and designated to be:

1. Did the seller expressly or impliedly warrant the turkeys, and if so, did it breach such warranty to the buyer's damage?

2. Did the seller fraudulently supply diseased turkeys to the buyer's damage?

3. Was there an accord and satisfaction that discharged liability, if any?

On appeal numerous assignments of error are made, the essence of which can be abstracted to a claim of error by the court in (1) instructing the jury that the seller made no express or implied warranty of the birds; (2) instructing the jury relative to the elements of fraud; (3) ruling upon questions of evidence relating to warranty, fraud and damage; and (4) allowing a recovery greater than the amount prayed for in the plaintiff's complaint.

On or before February 5, 1954, plaintiff delivered 8,017 Broad Breasted Bronze turkey poults to the defendants at Sandy, Utah, pursuant to a written order dated January 15, 1954. Defendants agreed to pay 85¢ per poult, totalling $6,814.45. The contract contained the following provisions with respect to warranties of the turkeys:

"This order is subject to the following conditions:

"Prices are subject to change upon thirty days notice. Prices given include delivery to you, or express charges prepaid to your nearest express office where delivery by truck is not practical.

"We guarantee full count of live chicks or poults at time of delivery; that they are true to breed; and that they will reach you as near delivery date ordered as possible.

*"The Cooperative is using its bests efforts to produce good chicks and poults.* Due to the nature of the business and the fact that we have no control over their feeding and care after they leave our hands, you will understand that we can not be responsible for them after delivery. *We therefore make no warranty, express or implied, as to health, quality, or productivity of chicks or poults delivered, and no agent of the Cooperative is authorized to make any warranty or representation to the contrary.* We do reserve the right to make refund for, or replace, any birds proven to our satisfaction to be defective upon delivery." (Emphasis added.)

An acceptance of the order, containing the same stipulations was mailed by plaintiff to defendants from Washington and the poults were delivered to defendants in Utah.

Although losses of young turkeys normally average from three to five per cent during the first eight weeks of their lives, defendants were apparently concerned over the condition of the poults in their brooder and took some of them to a veterinarian at intervals beginning when they were about one week old and continuing until the birds reached the age of twenty weeks. Various ailments of the turkeys at different times in different poults were analyzed as being infectious and intestinal bacteria (a condition

known as "Water Bellies"), enteritis, erosion of the gizzard, paralysis, Blackhead (a disease associated with unsanitary conditions), dehydration (caused by improper feeding and drinking), paratyphoid, and Newcastle. Infectious sinusitis, the basis of appellant's claim, appeared in birds examined at the ages of 4½ weeks and 20 weeks.

On February 15, 1954, 766 poults died in the Neff coops. Defendants made a careful investigation to determine the reason for this unusual mortality; there had been no recent change in feeding, light, or temperature which would account for it. Through his own examinations and reports from a laboratory, Mr. Neff concluded that many of the dead turkeys had been afflicted with sinusitis.

Expert witnesses testified that sinusitis may be transmitted through the egg when the breeder flock is infected; that it takes from two weeks to approximately ten weeks for sinusitis to incubate. No treatment will completely eliminate the disease but treatment in combination with proper management and sanitation will control the infection and allow some of the birds to gain in normal weight pattern. There was evidence that some of the flocks maintained by plaintiff's members, who supplied plaintiff, were infected with sinusitis.

Mr. Neff testified that turkeys marketed in 1954 were each four pounds below normal weight. Thirty-eight per cent of the turkeys which he bought from plaintiff died as compared to a normal loss to the time of marketability of eight to ten per cent.

Upon this factual foundation, defendants at the conclusion of the case stipulated to their liability for the purchase price of the turkeys and asserted a counterclaim for damage for breach of warranty and in fraud.

As a consequence of the stipulation the trial court directed a verdict in favor of plaintiff for the amount of $6,814.45 on its complaint. The court further ruled, in accordance with the provisions of the contract set forth above, that the parties had contracted against any implied or express warranty of the poults, but submitted interrogatories and general verdicts to the jury on the basis of fraud, in which the jury found that the false representation was made, that plaintiff knew or should have known it to be false, but that the representation was not made with the intention to defraud defendants and, although defendants relied upon the statement, such reliance and action thereon was not the proximate cause of their injury. The interrogatories were answered as follows:

"1. Did the Plaintiff represent to the Defendants at the time of sale of the poults in question 'that it, the Plaintiff, was using its best efforts to produce good poults?'

" 'Yes'

"2. If such representation was made to the Defendants at the time of the sale of such poults was such representation false?

" 'Yes'

"3. If such representation was so made, did the Plaintiff know it to be false or did Plaintiff make such statement recklessly without sufficient knowledge of which to base such representation?

" 'Yes'

"4. If such representation was made, was it made for the purpose of inducing Defendants to rely thereon?

" 'No'

"5. If such representation was made, did the Defendants, acting reasonably and in ignorance of its falsity, in fact rely upon such representation?

" 'Yes'

"6. If such representation was so made, were Defendants induced to act in reliance thereon to their damage?

" 'No'."

In its general verdicts, the jury found in favor of the plaintiff in the amount of

$6,814.45 as instructed by the court and against the defendants on their counterclaim no cause of action. Thereupon the court entered judgment for the plaintiff in the principal amount plus interest from February 5, 1954, the date of delivery, in the amount of $883.00 plus costs.

*Warranty and Fraud*

■ Defendants maintain, although they did not so argue to the trial court, that the instruction on fraud should have been given in accordance with the law of the state of Washington, where the contract was executed. The final act necessary to give validity to the contract, here the acceptance in Washington, determines the place of execution of the contract and the law of that place controls in the construction of the contract and the rights and duties of the parties under it. Kansas City Wholesale Grocery Co. v. Weber Packing Corporation, 93 Utah 414, 73 P.2d 1272; Williams v. Steamship Mutual Underwriting Ass'n, 45 Wash.2d 209, 273 P.2d 803.

■ Under Washington law, they further contend, the burden of proof upon one who alleges fraud is somewhat less than that levied upon them by the interrogatories and the court's instruction:

"That the elements of fraud, each of which must be proved by the defendants by clear and convincing evidence, are as follows:

"(1) A representation by the plaintiff

"(2) concerning a presently existing material fact

"(3) which was false

"(4) and which plaintiff either (a) knew was false, or (b) was made so recklessly by plaintiff, knowing that plaintiff had insufficient knowledge upon which to base such representation;

"(5) that the representation was made for the purpose of inducing the defendants to act upon it;

"(6) that defendants acted upon it reasonably and in ignorance of its falsity;

"(7) that the defendants did in fact rely upon such representation;

"(8) that defendants were thereby induced to act in reliance upon such representation; and

"(9) that they acted to their consequent and proximate resulting damage."

Such contention is without merit, for the Washington Supreme Court has set forth nine elements which constitute the definition of fraud which do not differ materially from those given in the instruction. See Graff v. Geisel, 39 Wash. 2d 131, 234 P.2d 884; Gray v. Wikstrom Motors, Inc., 14 Wash.2d 448, 128 P.2d 490.

Defendants requested an instruction which would authorize the jury to find fraud if the plaintiff knew that the poults sold to defendants were hatched from eggs produced by turkey hens that were diseased and did not so inform defendants, inasmuch as there would then exist a duty upon the plaintiff to inform the defendants of this fact, providing the other elements of fraud as outlined in the given instruction were found.

■ The statement, upon which defendants rely as being an actionable statement, "The Cooperative is using its best efforts to produce good chicks and poults," necessarily involves an exercise of individual judgment much the same as representations of other values. This type of representation has been categorized by some courts as "opinion" as opposed to "fact." The A.L.I. Restatement of Contracts, sec. 474, however, states that the important antithesis is between "knowledge" and "opinion" not "fact" and "opinion" and concludes that if the person conveying the statement has no reason to expect to be understood as giving more than an expression of his opinion the statement is not fraudulent unless it is an intentional misrepresentation and varies so far from the truth that no reasonable man in his position could have such an opinion. The Supreme Court of Washington has apparently adopted this point of view:

"Representations as to mere matter of opinion are usually not actionable at all. In order to be actionable they must be made, not only under circumstances clearly entitling the adverse party to rely upon them as true, and with the actual intent that he shall so rely, but with conscious knowledge on the part of the person making them that they are false. The fraud consists in representing as his opinion that which is not his opinion. In such a case there must be an actual intent to defraud, and this must be proved by positive evidence. On the other hand, where the representations are as to pure matters of fact, and made under circumstances entitling the adverse party to rely upon them as true, then the fact that they are false raises a legal presumption of fraudulent intent * * *." Grant v. Huschke, 74 Wash. 257, 133 P. 447, 449; Streeter v. Vaughan, 39 Wash.2d 225, 235 P.2d 193.

██ Especially in view of the express provisions in the contract reserving warranties immediately following the statement in question, it cannot be held as a matter of law that plaintiff, in making the statement, had reason to believe that defendants would accept this expression as a representation that the poults would be disease-free. The jury found that although the statement was false, presumably because they felt plaintiff should have taken more care in inspection of breeding flocks, etc., it was not made with the intention of misleading defendants to act to their detriment. Thus the plaintiff, not knowing that defendants had so interpreted the statement in the contract, was under no duty to inform them, even if it learned of sinusitis in its breeding flocks, of that fact. A.L.I. Restatement of Contracts, sec. 472. The statement was not a warranty and there was no error in giving the instruction on fraud nor in refusing to give defendants' requested instruction.

██ Defendants cite as error the refusal of the court to grant them a new trial under Rule 49, Federal Rules of Civil Procedure, 28 U.S.C.A., arguing that the jury's answers to Interrogatories No. 5 and No. 6 were inconsistent. By No. 5, the jury found that the defendants did in fact rely upon the representation; by No. 6, they found that the defendants were not induced to act in reliance thereon to their damage. Such findings are not inconsistent, especially in view of evidence introduced by defendants, themselves, as to the numerous ailments from which these turkeys suffered and the failure to show that sinusitis was the cause of death in any of the birds.

*Evidence*

Numerous errors are alleged in the exclusion of evidence. The evidence was excluded as hearsay, cumulative or because no proper foundation was laid; we have reviewed the alleged errors and the value defendants claim for their proposed testimony and are unable to find either error or, in the light of the jury's answers to interrogatories, prejudice to the defendants. Larson v. General Motors Corp., 2 Cir., 148 F.2d 319.

*Judgment*

Finally, defendants complain that judgment was rendered for an amount greater than that prayed in the complaint. In its complaint, plaintiff alleged that the contract price was $6,814.45, and that after delivery of the birds defendants had agreed to pay for a lesser number at the agreed price of $6,015.45. The prayer asks judgment for this amount. This allegation of accord and satisfaction was denied by defendant in his answer.

The evidence shows that after the night of the unusual loss in turkey poults Mr. Neff had a conversation with Mr. Oldenburg, manager of the plaintiff corporation, in which Neff stated that he felt that the cause of the losses was defective stock received from Washington. Defendant Neff further testified that Mr. Oldenburg offered to pay for the loss above five per cent and to pay for the medication up to eight weeks of age, but the offer was not accepted.

■■ At the trial the parties stipulated that the verdict on plaintiff's complaint should be for the full amount of the original contract purchase price and such agreement governs the case regardless of the prayer of the complaint. Although judgment is limited to the amount demanded in a default judgment, Rule 54(c), Federal Rules of Civil Procedure, it is not error to grant relief beyond that prayed in a contested action. Couto v. United Fruit Co., 2 Cir., 203 F. 2d 456; Fanchon & Marco, Inc. v. Paramount Pictures, 2 Cir., 202 F.2d 731, 36 A.L.R.2d 1336; Garland v. Garland, 10 Cir., 165 F.2d 131.

■ Interest was properly allowed from the date of delivery of the merchandise inasmuch as the amount was liquidated at that time and there is no evidence as to an arrangement for an extension of credit. A. W. Hartman Shoe Co. v. Hanson, 135 Wash. 512, 238 P. 17.

Judgment is affirmed.